**IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
MISSOURI EASTERN DIVISION**

| | |
|---|---|
| DILLAN NEWBOLD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF SAINT LOUIS, MISSOURI, | ) Cause No.: 4:18-cv-01572 |
| COL. GERALD LEYSHOCK, in his | ) |
| individual and official capacities, | ) JURY TRIAL DEMANDED |
| LT. SCOTT BOYHER, in his individual | ) |
| and official capacities, LT. TIMOTHY | ) |
| SACHS, in his individual and official | ) |
| capacities, SGT. RANDY JEMERSON, | ) |
| in his individual and official capacities, | ) |
| SGT. MATTHEW KARNOWSKI, in his | ) |
| individual and official capacities, | ) |
| SGT. BRIAN ROSSOMANNO, in his | ) |
| individual and official capacities, | ) |
| TERRENCE RUFFIN, in his | ) |
| individual and official capacities, and | ) |
| JOHN DOEs #1-5, in their individual | ) |
| and official capacities. | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendants City of St. Louis and Col. Gerald Leyshock, Lt. Scott Boyher, Lt. Timothy

Sachs, Sgt. Randy Jemerson, Sgt. Matthew Karnowski, and Sgt. Brian Rossomanno

(Defendants), file this answer and affirmative defenses to Plaintiff's Second Amended

Complaint. Any averment of fact that is not expressly admitted herein is denied.

**JURISDICTION AND VENUE**

1.      Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth

1

Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

**ANSWER:   Paragraph 1 states no allegations of fact requiring no response. To the extent a response is required, Defendants admit that Plaintiff brings this action under 42. U.S.C. § 1983, but denies the apparent allegation of a direct action under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.**

2.   The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

**ANSWER:   Paragraph 2 states no allegations of fact, requiring no response. To the extent a response is required, Defendants admit that this Court has jurisdiction.**

3.   Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

**ANSWER:   Paragraph 3 states no allegations of fact, requiring no response. To the extent a response is required, Defendants admit that venue is proper.**

4.   Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

**ANSWER:   Paragraph 4 states no allegations of fact, requiring no response. To the extent a response is required, Defendants admit that venue is proper.**

5.   This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

2

**ANSWER:**   **Paragraph 5 states no allegations of fact, requiring no response. To the extent a response is required, Defendants deny paragraph 5's allegations.**

6.      Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

**ANSWER:**   **Defendants admit that Plaintiff has requested a jury trial.**

## PARTIES

7.      Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first- class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

**ANSWER:**   **Defendants admit that the City of St. Louis is a constitutional charter City organized and existing under the laws of the State of Missouri, but deny all other allegations of paragraph 7.**

8.      The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

**ANSWER:**   **Defendants admit that the division of police is a division or agency of the City of St. Louis and is commonly known as the St. Louis Metropolitan Police Department, and that the Division of Police operates in accordance with law as a division within City government, but deny all other allegations of paragraph 8.**

9.      The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

**ANSWER:**   **Defendants deny the allegations of paragraph 9.**

10.      Gerald Leyshock is employed as a police officer with the SLMPD. Mr. Leyshock has the rank of lieutenant colonel. Mr. Leyshock was the incident commander during

the events of September 17, 2017. Lieutenant Colonel Leyshock knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendant admits Gerald Leyshock is employed as a police officer with the division of police and has the rank of lieutenant colonel. Defendants admit Gerald Leyshock was the incident commander during the events of September 17, 2017. Defendants deny all remaining allegations of paragraph 10.**

11.    Scott Boyher is employed as a police officer with the SLMPD. Mr. Boyher has the rank of lieutenant. Mr. Boyher was on the ground supervising SLMPD officers during the events of September 17, 2017. Lieutenant Boyher knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendants admit that Lt. Boyher was a lieutenant with the Division of Police, and that he supervised officers of the Bicycle Response Team on September 17, 2017. Defendants further admit that Lt. Boyher is currently employed by the Division of Police. Defendants deny paragraph 11's remaining allegations.**

12.    Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest. Lieutenant Sachs knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendants admit Timothy Sachs was employed with the division of police and had the rank of lieutenant. Defendants admit Timothy Sachs was present for protest**

4

**activities and police response on September 17, 2017. Defendants deny all remaining allegations in paragraph 12.**

13.     Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Jemerson knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendants admit Randy Jemerson is currently employed as a police officer with the division of police and has the rank of lieutenant.  Defendants admit that Randy Jemerson was a supervisor with the Civil Disobedience Team. Defendants deny all remaining allegations in paragraph 13.**

14.     Matthew Karnowski is employed as a police officer with the SLMPD. Mr. Karnowski has the rank of sergeant. Mr. Karnowski was on the ground supervising SLMPD officers during the events of September 17, 2017. He declared the protests an "unlawful assembly" which SLMPD used as a predicate to the arrests and use of chemical agents. Sergeant Karnowski knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendants admit Matthew Karnowski is employed with the division of police and has the rank of sergeant. Defendants admit Matthew Karnowski was present for protest activities and police response on September 17, 2017. Defendants deny all remaining allegations in paragraph 14.**

15.     Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno has the rank of sergeant. He is a supervisor with the SLMPD's Civil

Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Rossomanno knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendants admit Brian Rossomanno was employed with the division of police and had the rank of sergeant during the events of September 17, 2017. Defendants admit Brian Rossomanno was a supervisor of the Civil Disobedience Team. Defendants deny all remaining allegations in paragraph 15.**

16.     Terrence Ruffin is employed as a police officer with the SLMPD. Officer Ruffin arrested Plaintiff on September 17, 2017. Officer Ruffin knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:   Defendants admit Terrence Ruffin was employed as a police officer with the division of police on September 17, 2017. Defendants deny all remaining allegations of paragraph 16.**

17.     John Does #1-5 are as of yet unidentified police officers with the St. Louis Metropolitan Police Department. These unnamed defendants arrested Plaintiff, used chemical munitions against Plaintiff, beat Plaintiff, prevented Plaintiff from leaving the area, and unlawfully arrested Plaintiff. Plaintiff has been unable to identify these officers because they removed their name tags from their uniforms in violation of guidance promulgated by the U.S. Department of Justice and standard law enforcement practices. Further, the officers wore masks concealing their faces. But for their own actions, these officers could have been identified. John Does #1-5 knew or should have known that there was no probable cause for the

arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:**   **Defendants deny paragraph 17's allegations.**

18.     Plaintiff is a medical student at Washington University School of Medicine.

**ANSWER:**   **Defendants are without sufficient information to form a belief as to the truth of paragraph 18's allegations, and therefore deny the same.**

### FACTS

19.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith. *See* Exh. A, Stockley Verdict.

**ANSWER:**   **Defendants admit the allegations of paragraph 19 and the accuracy of the referenced exhibit A.**

20.     This acquittal shocked many in the St. Louis community as an audio recording submitted into evidence in the trial captured Officer Stockley saying "we're killing this motherfucker, don't you know" in reference to Mr. Smith. *Id*. at 5.

**ANSWER:**   **Defendants are without sufficient information to form a belief as to the truth of how anyone in particular reacted to the verdict or why they reacted, and therefore deny the same.**

21.      Further, evidence showed that during the incident Officer Stockley was in possession of an assault rifle that had not been issued to him by the SLMPD. *Id*. at 23.

**ANSWER:**   **Defendants admit that exhibit A contains a finding regarding an assault rifle.**

22.     In addition, Officer Stockley claimed to find a gun in Mr. Smith's car after he killed Mr. Smith. *Id*. at 25.

7

**ANSWER:   Defendants admit that exhibit A contains a finding that Officer Stockley found a gun in the deceased drug dealer's car.**

23.     Only Officer Stockley's DNA was found on the gun, leading many, including the Circuit Attorney of the City of St. Louis, to believe that Stockley planted the gun on Mr. Smith after Mr. Smith's death, in an effort to justify the killing. *Id*. at 12.

**ANSWER:   Defendants lack sufficient knowledge and information to admit the allegations of paragraph 23, which are in any event immaterial to this action.**

24.     At trial, Officer Stockley's partner did not testify in Stockley's defense. Rather, the partner invoked his Fifth Amendment right against self-incrimination.

**ANSWER:   Defendants lack sufficient knowledge and information to admit the allegations of paragraph 24, which are in any event immaterial to this action.**

25.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

**ANSWER:   Defendants admit paragraph 25's allegations**

26.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

**ANSWER:   Defendants lack sufficient knowledge and information to admit the allegations of paragraph 26.**

27.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

**ANSWER:   Defendants lack sufficient knowledge and information to admit the allegations of paragraph 27.**

28.     In response to the protests, St. Louis Metropolitan police officers amassed at

several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields  and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

**ANSWER:   Defendants admit that, in response to threats of civil disorder, police officers were deployed at various locations, but Defendants deny that all such officers were fully equipped with riot gear or chemical agents; Defendants deny all other allegations of paragraph 28.**

29.     This is in stark contrast to SLMPD's appearance at a multitude of other un- permitted protests where the police themselves are not the target of the protest, including an anti- Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

 **ANSWER:   Defendants deny paragraph 29's allegations.**

30.     Virtually all of the protests were non-violent.

**ANSWER:   Defendants deny paragraph 30's allegations.**

31.     On three occasions, a handful of protesters committed minor property damage, including broken windows and broken flower pots.

**ANSWER:   Defendants admit that protests became violent and protesters engaged in acts of assault and vandalism in September 2017 in the City of St. Louis; defendants deny all other allegations of paragraph 31.**

32.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest  activity, including but not limited to the following:

          a.      The afternoon of Friday, September 15, 2017, near the intersection of

Clark and Tucker Avenues.

b.       The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.       The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.       The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.       The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.       The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.       The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.       The evening of Friday, September 15, 2017, on Hortense Place.

i.       The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.       The evening of September 29, 2017 outside of Busch Stadium.

**ANSWER:**   **Defendants admit that in responding to illegal conduct by persons engaged in disorderly protest and other group actions in September 2017 in the City of St. Louis, some police officers utilized chemical agents in a reasonable and lawful manner; Defendants otherwise deny each and every allegation of paragraph 32 and each subparagraph thereof.**

10

33.     These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

**ANSWER:**     **Defendants deny paragraph 33's allegations.**

34.     In October 2014, SLMPD fired chemical agents at protestors on South Grand.

**ANSWER:**     **Defendants deny paragraph 34's allegations.**

35.     In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

**ANSWER:**     **Defendants deny paragraph 35's allegations.**

36.     On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

      (a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
      (b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;
      (c)     without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
      (d)     without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)     utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D.

11

Mo. Dec. 11, 2014) at 3.

**ANSWER:**   **Defendants admit that an order was entered as reflected in Exhibit B and that a portion of that order is quoted in paragraph 36; Defendants deny all other allegations of paragraph 36.**

37.     This suit was in response to SLMPD firing chemical agents into a business where peaceful protestors had congregated without allowing the protestors to leave.

**ANSWER:**   **Defendants deny paragraph 37's allegations.**

38.     The City entered into a settlement agreement on March 25, 2015, where it agreed as follows:

> **A.**   Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:
> (1)   utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:
>
> > (a)   without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
> > (b)   without providing the individuals sufficient opportunity to heed the warnings and exit the area;
> >
> > (c)   without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
> > (d)   without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.
>
> (2)   utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.
>
> **B.**   Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat. *See* Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar. 25, 2015) at 1-2.

**ANSWER:   Defendants admit that the City of St. Louis entered into a consent decree in settlement of claims in the case styled *Templeton v. Dotson, et al*., as reflected in Exhibit C and that a portion of the consent decree is quoted in paragraph 38; Defendants object to allegations pertaining to a settlement agreement as a basis for a complaint and Defendants deny all other allegations of paragraph 38.**

39.     Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

**ANSWER:    Defendants deny paragraph 39's allegations.**

40.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning. *See* Exh. D, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 69.

**ANSWER:    Defendants admit that Exhibit D is a transcript of testimony in the proceeding described in paragraph 40, but Defendants otherwise deny the allegations of paragraph 40.**

41.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *Id*. at 50-52. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id.* SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people

peacefully standing on or in their own properties. *Id.* Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

**ANSWER:    Defendants deny paragraph 41's allegations.**

42.    On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. *Id.* at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

**ANSWER:    Defendants admit that a group of violent persons attempted to invade the premises of a correctional facility known as the Medium Security Institution of the City of St. Louis in July 2017, and that reasonable and lawful measures were taken by police officers to protect themselves and the facility; Defendants otherwise deny the allegations of paragraph 42.**

43.    Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and  using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton.*

**ANSWER:    Defendants deny paragraph 43's allegations.**

44.    This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

**ANSWER:    Defendants deny paragraph 44's allegations.**

14

45.     According to Defendant Rossomanno, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flower pots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis. *See* Exh. E, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 188.

**ANSWER:   Defendants admit at various points on September 17, 2017 individuals engaged in various forms of property damage. Defendants deny the remaining allegations in paragraph 45.**

46.     There is no evidence nor allegations that Plaintiff was in any way involved in this destruction of property.

**ANSWER:   Defendants deny paragraph 46's allegations.**

47.     Defendants testified that Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendants. *Id*. at 191.

**ANSWER:   Defendants admit that Defendant Leyshock was the incident commander on September 17, 2017. Defendants deny paragraph 47's allegations.**

48.     Defendants testified that Defendant Sachs was in direct command of the officers in tactical gear. *Id*.

**ANSWER:   Defendants deny paragraph 48's allegations.**

49.     Defendant Rossomanno also testified that at approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions." *See* Exh. F, Rossomanno Declaration, *Ahmad v. St. Louis*, No. 4:17- cv-02455 (E.D. Mo. Oct. 12, 2017), Doc. 33-6 at 4.

**ANSWER:   Defendants admit protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendants otherwise deny**

paragraph 49's allegations.

50.     Defendant Rossomanno testified that a second dispersal order was given at 8:51 PM. *Id.* at 5.

**ANSWER:   Defendants admit protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendants otherwise deny paragraph 50's allegations.**

51.     Plaintiff was not present for these alleged dispersal orders.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 51's allegations and therefore deny the same.**

52.     Defendants Rossomanno and Jemerson directed people to the intersection of Washington and Tucker, where the Defendants had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff. *See* Exh. E at 195.

**ANSWER:   Defendants deny paragraph 52's allegations.**

53.     Although Defendant Sachs heard some sort of order being given, he testified that he could not make out "exactly what was being said." *See* Exh. E at 25.

**ANSWER:   Defendants admit that Exhibit E is quoted in part in paragraph 53, but defendants deny all other allegations and conclusions of paragraph 53.**

54.     Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:   Defendants admit that on September 17, 2017 officers blocked certain roads downtown. Defendants otherwise deny the allegations of paragraph 54.**

55.     Defendant Karnowski testified that he and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. *See*

Exh. E at 125-126. He also testified that he determined that the protest that evening was an "unlawful assembly." *Id*. at 136-137.

**ANSWER:**   **Defendants admit that on the evening of September 17, 2017 an unlawful assembly was occurring in the vicinity of Washington and Tucker. Defendants otherwise deny paragraph 55's allegations.**

56.   This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

**ANSWER:**   **Defendants admit paragraph 56's allegations.**

57.   Defendant Sachs came up with the plan to arrest everyone present. *See* Exh. E at 27. He presented his plan to Defendant Leyshock, who approved the plan. *Id*. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard. *Id.* at 27- 40.

**ANSWER:**   **Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 57's allegations.**

58.   Defendants Leyshock, Sachs, Rossomanno, and Jemerson knew or should have known that their plan to kettle the people that SLMPD directed to the intersection of Washington and Tucker and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate said arrests.

**ANSWER:**   **Defendants deny paragraph 58's allegations.**

59.   At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

**ANSWER:**   **Defendants admit police officers formed lines in the vicinity of Washington**

and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 59's allegations.

60.     This was nearly three hours after the windows and flower pots were broken and many blocks away from the damaged businesses.

**ANSWER:     Defendants deny paragraph 60's allegations.**

61.     SLMPD's Civil Disobedience Team appeared at the scene.

**ANSWER:     Defendants admit paragraph 61's allegations.**

62.     A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

**ANSWER:     Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 62's allegations.**

63.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

**ANSWER:     Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 63's allegations.**

64.     A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

**ANSWER:     Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 64's allegations.**

65.     All three of these lines were comprised of officers all wearing military-like

tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

**ANSWER:   Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 65's allegations.**

66.     A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

**ANSWER:   Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 66's allegations.**

67.     These officers were carrying bicycles and were being directed by Defendant Boyher. *See* Exh. E at 30-31.

**ANSWER:   Defendants admit some officers were equipped with bicycles and some such officers were under the supervision of Defendant Boyher. Defendants otherwise deny the allegations of paragraph 67.**

68.     Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:   Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise deny paragraph 68's allegations.**

69.     Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people

trapped inside from leaving.

**ANSWER:    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 69's allegations.**

70.     As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

**ANSWER:    Defendants deny paragraph 70's allegations.**

71.     As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, the officers blocked anyone from leaving the area.

**ANSWER:    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 71's allegations.**

72.     Video evidence shows multiple citizens approaching officers and requesting to be let through. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!" *See* Exh. G.

**ANSWER:    Defendants deny paragraph 72's allegations.**

73.     In addition, the closing phalanxes of officers cut off access to all alleys and other means of egress.

**ANSWER:**    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 73's allegations.

74.    As the four lines closed, they trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:**    Defendants admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise deny paragraph 74's allegations.

75.    This is a law enforcement tactic known as "kettling."

**ANSWER:**    Defendants deny paragraph 75's allegations.

76.    The SLMPD police officers kettled self-admitted protestors, residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, a homeless person, and an even an undercover SLMPD officer.

**ANSWER:**    Defendants deny paragraph 76's allegations.

77.    Video evidence even shows the officers grabbing an African-American male who was outside of the kettle and throwing him into the kettle.

**ANSWER:**    Defendants deny paragraph 77's allegations.

78.    As the kettle closed, video evidence shows many individuals approaching the officers and begging to pass.

**ANSWER:**   **Defendants deny paragraph 78's allegations.**

79.   Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

**ANSWER:**   **Defendants deny paragraph 79's allegations.**

80.   Video evidence shows individuals peacefully approaching the bicycle officers with their hands up.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 80's allegations and therefore deny the same.**

81.   In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

**ANSWER:**   **Defendants deny paragraph 81's allegations.**

82.   Defendants Boyher and Karnowski were directing these officers. *See* Exh. E at 30, 119, and 124. Rather than defuse the situation, Defendants Boyher and Karnowski directed the officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests.

**ANSWER:**   **Defendants admit Boyher and Karnowski were present and acting in a supervisory role. Defendants otherwise deny the allegations of paragraph 82.**

83.   Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

**ANSWER:**   **Defendants deny paragraph 83's allegations.**

84.   Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

**ANSWER:   Defendants admit that some persons subject to arrest complied with police directives while other persons did not. Defendants otherwise deny paragraph 84's allegations.**

85.    Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

**ANSWER:   Defendants deny paragraph 85's allegations.**

86.    Many were kicked, beaten, and dragged.

**ANSWER:   Defendants deny paragraph 86's allegations.**

87.    Upon information and belief, an undercover African-American SLMPD police officer who was near the intersection was arrested and beaten by other SLMPD police officers.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 87's allegations and therefore deny the same**

88.    Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

**ANSWER:   Defendants admit individuals were wore masks and goggles concealing their identities. Defendants otherwise deny paragraph 88's allegations.**

89.    Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

**ANSWER:   Defendants deny paragraph 89's allegations.**

90.     In response, SLMPD officers roughly removed the goggles and then sprayed some of those individuals directly in the face.

**ANSWER:**    **Defendants deny paragraph 90's allegations.**

91.     At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

**ANSWER:**    **Defendants deny paragraph 91's allegations.**

92.     These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

**ANSWER:**    **Defendants deny paragraph 92's allegations.**

93.     Defendant Rossomanno can be seen on video within arms-length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, Defendant Rossomanno took control of the situation and directed the officers' unlawful actions.

**ANSWER:**    **Defendants deny paragraph 93's allegations.**

94.     SLMPD officers used hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

**ANSWER:**    **Defendants admit some plastic zip tie handcuffs were used in an appropriate manner. Defendants otherwise deny paragraph 94's allegations.**

95.     Over 100 people were arrested that night.

**ANSWER:**    **Defendants admit paragraph 95's allegations.**

96.     During and after the arrests, SLMPD officers were observed high fiving each

24

other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

**ANSWER:   Defendants admit some chanting occurred for which officers were later reprimanded. Defendants otherwise deny the allegations of paragraph 96.**

97.    That evening, the following celebratory picture was posted on Twitter by an anonymous person:



**ANSWER:   Defendants admit the photo was posted by an anonymous person. Defendants otherwise deny the allegations of paragraph 97.**

98.    By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendants.

**ANSWER:** **Defendants deny paragraph 98's allegations**

99.   Defendants' actions did not occur randomly. Rather, Defendants decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

**ANSWER:** **Defendants deny paragraph 99's allegations**

100.   The next day, the SLMPD Acting Chief reinforced the City's ratification of the Defendants' actions when he said, "I'm proud to say the city of St. Louis and the police owned the night," while standing next to Saint Louis Mayor Lyda Krewson.

**ANSWER:** **Defendants deny paragraph 100's allegations**

101.   The day after the arrests, Mayor Krewson further validated the illegal actions of Defendants when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

**ANSWER:** **Defendants admit that St. Louis police properly enforced the law during the period in question. Defendants otherwise deny the allegations in paragraph 101.**

102.   On November 29, 2018, four SLMPD officers were indicted for their actions on September 17, 2017. Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno.

**ANSWER:** **Defendants admit certain officers have been indicted for unauthorized illegal activity. These officers are in the process of being disciplined. Defendants otherwise deny the allegations in paragraph 102.**

103.   When detaining individuals in custody who require medical care, the City of

St. Louis and its SLMPD has established the following policy:

<u>PRISONERS REQUIRING MEDICAL ATTENTION</u> (72.6.1)

1.   A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2.   Should a prisoner require <u>emergency </u>medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the

paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

3.   Should a prisoner require <u>non-emergency </u>medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.

4.   The confidential relationship of doctor and patient extends to prisoner patients and their physician.

5.   In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If practical, the photos should be taken both prior to the application of bandages, etc., and after the injury has received appropriate medical attention

<u>PRISONER HEALTH SCREENING</u> (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded on the Field Booking Form when prisoners are booked and verified upon their transfer to another facility or release:

1.   Current health and medical history of the prisoner; (72.6.3.a)
2.   Medication taken by the prisoner; (72.6.3.b)
3.   Known medication/drug allergies;
4.   Behavior, including state of consciousness and mental status; and (72.6.3.c)
5.   Body deformities, trauma markings, bruises, lesions, jaundice (a yellowness of the skin and whites of the eyes), and ease of movement (72.6.3.d)

<u>NOTE:</u>  a copy of the Field Booking Form **must** be attached to the computerized Arrest

Register whenever a prisoner is transferred to the City Justice Center.

**ANSWER:**   **Defendants admit paragraph 103's allegations.**

104.   On information and belief, the SLMPD and City of St. Louis Correctional Staff failed and/or refused to follow this policy when they provided no medical care to any of the people illegally pepper sprayed or who.

**ANSWER:**   **Defendants deny paragraph 104's allegations.**

105.   Defendants' decision to ignore the policy constitutes a custom and practice of failing and/or refusing to follow this policy designed to protect the safety and wellbeing of injured individuals in police custody, showing a deliberate indifference by Defendants to the rights of Plaintiff and other injured detainees.

**ANSWER:**   **Defendants deny paragraph 105's allegations.**

106.   Despite this policy, at no time between their arrest and their release from the St. Louis City Justice Center did any police officer or other city official provide any arrestee with medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

**ANSWER:**   **Defendants deny paragraph 106's allegations.**

107.   Upon their release, all of the arrestees were given summonses showing that they had been charged with "failure to disperse." They were instructed to appear at St. Louis City Municipal Court on October 18, 2017.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 107's allegations and therefore deny the same**

108.   They were charged as such even though SLMPD officers provided no means of egress, denied repeated requests to be allowed to leave, and kettled the individuals.

28

**ANSWER:**   **Defendants deny paragraph 108's allegations.**

109.   In at least one case, a person was thrown from outside of the kettle into the kettle by SLMPD and was subsequently arrested for failure to disperse.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 109's allegations and therefore deny the same.**

110.   The press release stated "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob. Multiple businesses also sustained property damage and one officer suffered a serious injury."

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 110's allegations and therefore deny the same.**

111.   Egregiously and in an attempt to further punish its victims, SLMPD publicly released the addresses of the arrestees.

**ANSWER:**   **Defendants deny paragraph 111's allegations.**

112.   The video evidence, as the federal court observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area" – much less a mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by SLMPD.

**ANSWER:**   **Defendants deny paragraph 112's allegations.**

113.   SLMPD used its Twitter account to disseminate this false statement to its approximately 70,000 followers. SLMPD subsequently deleted the tweet.

**ANSWER:**   **Defendants deny paragraph 113's allegations.**

114.   During a preliminary injunction hearing, attorneys representing the City stated that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is

justified in declaring an unlawful assembly and then deploying chemical agents regardless of the proximity of the target individuals in time or space to the property damage and regardless of if the people were engaged in criminal activity. According to the City, officers are justified to use chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

 **ANSWER:   Defendants deny paragraph 114's allegations.**

115.   On October 13, 2017, the St. Louis City Counselor's office issued a letter stating "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges." *See* Exh. H.

**ANSWER:   Defendants admit that Exhibit H is quoted in part in paragraph 115. Defendants otherwise deny paragraph 115's allegations.**

116.   On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Exh. I, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

**ANSWER:   Defendants admit that an order was entered as reflected in Exhibit I. Defendants otherwise deny paragraph 116's allegations.**

117.   The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to

protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

**ANSWER:   Defendants admit that Exhibit I is quoted in part in paragraph 117, but Defendants deny all other allegations and conclusions of paragraph 117.**

118.   The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id*. at 9.

**ANSWER:   Defendants admit that Exhibit I is quoted in part in paragraph 118. Defendants otherwise deny paragraph 118's allegations.**

119.   The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id*. at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id*. at 8-9.

**ANSWER:   Defendants admit that Exhibit I is quoted in part in paragraph 119. Defendants otherwise deny paragraph 119's allegations.**

120.   The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

**ANSWER:   Defendants admit that Exhibit I is quoted in part in paragraph 120. Defendants otherwise deny paragraph 120's allegations.**

121.   The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a

large crowd congregating in the streets" and "(n)o violent activity by protesters can be observed on the video." *Id.* at 10. In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

**ANSWER:    Defendants admit that Exhibit I is quoted in part in paragraph 121. Defendants otherwise deny paragraph 121's allegations.**

122.    The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12. The Court found that no audible warning could be heard on the video. *Id.*

**ANSWER:    Defendants admit that the District Court entered an order as reflected in Exhibit I. Defendants otherwise deny paragraph 122's allegations.**

123.    The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

**ANSWER:    Defendants admit that Exhibit I is quoted in part in paragraph 123. Defendants otherwise deny paragraph 123's allegations.**

124.    In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id.* at 37. Not

surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

**ANSWER:   Defendants admit that Exhibit I is quoted in part in paragraph 124, but Defendants deny all other allegations and conclusions of paragraph 124.**

125.    The Court made the following findings:

a.    Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id*. at 35-36.

b.    Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

c.    Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id*. at 37. (Emphasis added).

d.    Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of

33

plaintiffs' constitutional rights. *Id*.

e.      Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

f.      Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

g.      Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

h.      Plaintiffs have presented sufficient, credible testimony and video

34

evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id*. at 42.

i.     The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

j.     Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 44.

k.     Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id*. at 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d

685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id*. at 44-45.

**ANSWER:   Defendants admit that Exhibit I is quoted in part by paragraph 125, but Defendants otherwise deny the allegations and conclusions of paragraph 125 and each of its subparts.**

126.    Upon information and belief, senior officials of the SLMPD, including Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

**ANSWER:   Defendants deny the allegations and conclusions of paragraph 126.**

### ALLEGATIONS (SPECIFIC)

127.   Dillan Newbold ("Mr. Newbold") is a medical student at Washington University School of Medicine. He has lived in the St. Louis area since 2014.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 127's allegations and therefore deny the same.**

128.   Mr. Newbold participated in protests before September 2017, including Black Lives Matter protests following the killing of Michael Brown, and protests against the Trump administration's unconstitutional immigration ban.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 128's allegations and therefore deny the same.**

129.   On September 17, 2017, at approximately 11:00 PM, Mr. Newbold went with a friend to the protests the acquittal of Jason Stockley in downtown St. Louis.

36

**ANSWER:   Defendants are without sufficient information to form a belief as to the truth of paragraph 129's allegations and therefore deny the same**

130.   Mr. Newbold parked at the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 130's allegations and therefore deny the same.**

131.   Mr. Newbold noticed there were approximately 100 people scattered around the area. There were no large groups, no chants, and no signs.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 131's allegations and therefore deny the same.**

132.   Mr. Newbold walked west on Washington Avenue, south on Thirteenth Street, and then east on St. Charles Avenue, arriving at the intersection of St. Charles Avenue and Tucker Boulevard.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 132's allegations and therefore deny the same.**

133.   At the intersection, Mr. Newbold saw a group of police officers with bicycles roaming around, herding pedestrians north toward the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 133's allegations and therefore deny the same.**

134.   Mr. Newbold heard screaming from an alley on St. Charles Avenue and went over to see what was happening.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 134's allegations and therefore deny the same.**

135.    Mr. Newbold saw a line of police officers in riot gear marching quickly down the alley.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 135's allegations and therefore deny the same.**

136.    Mr. Newbold attempted to retreat to his car, one block north at the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 136's allegations and therefore deny the same.**

137.    Mr. Newbold did not hear any police warnings or orders to disperse, at any point in the night.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 137's allegations and therefore deny the same.**

138.    A crowd started forming at the intersection. Washington Avenue was blocked off 100 feet to the east by a line of bike cops. Three full lines of riot police sealed off all of paths of egress and marched inward, beating batons in unison. The crowd grew increasingly compact as the police pushed people into the northeast corner of the intersection. Mr. Newbold asked officers directly, "how can we leave?" Shouts of "move back" were the only response.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 138's allegations and therefore deny the same.**

139.    It became apparent that the SLMPD might use chemical weapons against the protestors. Mr. Newbold feared for his safety, so he put on a bandana and goggles.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 139's allegations and therefore deny the same.**

140.   Once all of the civilians who had previously occupied a one-block radius were forced into a single cluster, another team of heavily armored police entered the intersection and quickly approached them. The civilians immediately put up their arms and began sitting down.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 140's allegations and therefore deny the same.**

141.   Mr. Newbold heard an officer order the crowd to get down, but he did not know whether the officer meant for people to sit or lie down. Mr. Newbold sat down.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 141's allegations and therefore deny the same.**

142.   Mr. Newbold used his phone to film the surrounding activities for approximately ten seconds.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 142's allegations and therefore deny the same.**

143.   A police officer told Mr. Newbold, "Put your damn phone away." The officer immediately sprayed a small amount of pepper spray in his face.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 143's allegations and therefore deny the same.**

144.   Mr. Newbold stopped filming, as directed; put his head down; and moved into a fetal position.

**ANSWER:**   **Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 144's allegations and therefore deny the same.**

145.   At no point did Mr. Newbold resist the police officers.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 145's allegations and therefore deny the same.**

146.    A police officer reached down; pulled off Mr. Newbold's bandana and goggles; grabbed his waistband; and dragged him approximately five feet out into the street, scraping his hip and knee.

**ANSWER:    Defendants deny the allegations in paragraph 146.**

147.    Another police officer pepper sprayed Mr. Newbold directly in the face, from a range of approximately two feet.

**ANSWER:    Defendants deny the allegations in paragraph 147.**

148.    Mr. Newbold's hands were tightly zip tied behind his back, leaving him no chance to wipe his face off.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 148's allegations and therefore deny the same.**

149.    Mr. Newbold had trouble breathing and shouted, "I can't breathe."

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 149's allegations and therefore deny the same.**

150.    An officer immediately shouted, "You can't breathe? That's what idiots say!"

**ANSWER:    Defendants deny the allegations in paragraph 150.**

151.    Officers told Mr. Newbold that he deserved the pain that he was in.

**ANSWER:    Defendants deny the allegations in paragraph 151.**

152.   One police officer stood over Mr. Newbold and mocked him, saying, "Are you proud now? Are you going to tell your wife about this? You better not. I'm so glad I'm in St. Louis and get to do shit like this!"

**ANSWER:   Defendants deny the allegations in paragraph 152.**

153.   A police officer picked Mr. Newbold up and walked him towards the transport vehicles. He was still blinded by pepper spray.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 153's allegations and therefore deny the same.**

154.   A few minutes after being zip tied, Mr. Newbold began to notice intense pain in his wrists and hands. His hands quickly began feeling numb

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 154's allegations and therefore deny the same.**

155.   Mr. Newbold asked at least six police officers at the scene to loosen the zip ties. He told several officers that he was concerned about nerve damage. The officers ignored  Mr. Newbold's requests for loosening.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 155's allegations and therefore deny the same.**

156.   Officers placed Mr. Newbold in the back of a truck and photographed him.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 156's allegations and therefore deny the same.**

157.   Mr. Newbold was then moved to the back of a van with approximately eight other arrestees.

**ANSWER:   Defendants are without sufficient knowledge or information to form a**

belief as to the truth of paragraph 157's allegations and therefore deny the same.

158.    The driver of the van slammed on the brakes during transport to the St. Louis City Justice Center, slamming the arrestees into one another.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 158's allegations and therefore deny the same.**

159.    Approximately fifteen minutes after his arrest, Mr. Newbold lost all sensation in his hands.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 159's allegations and therefore deny the same.**

160.    Officers moved Mr. Newbold to a holding cell with approximately thirty other people.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 160's allegations and therefore deny the same.**

161.    When Mr. Newbold got to the holding cell, his hands were dark purple, and he tried to get police officers' attention to loosen the zip ties.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 161's allegations and therefore deny the same.**

162.    Approximately ten minutes later, an officer removed the zip ties on Mr. Newbold's hands. The zip ties were so tight that the officer struggled to cut them. When the zip ties came off, Mr. Newbold's underlying skin was very dark and sharply indented. This was about an hour and fifteen minutes after his arrest.

**ANSWER:    Defendants are without sufficient knowledge or information to form a**

**belief as to the truth of paragraph 162's allegations and therefore deny the same.**

163.    Mr. Newbold was the only one in the holding cell without zip ties binding his hands.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 163's allegations and therefore deny the same.**

164.    Mr. Newbold was detained for over fifteen hours. Throughout the night and the next morning, he was repeatedly moved from one cell to another. Most cells contained around 30 other arrestees.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 164's allegations and therefore deny the same.**

165.    The pepper sprayed on Mr. Newbold's face, neck and hands during his arrest continued to cause him pain throughout the night. He was concerned about residual pepper spray caught below his contact lenses but did not remove them because his hands were still coated in dry mace.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 165's allegations and therefore deny the same.**

166.    Mr. Newbold experienced continuing pain and hypersensitivity to heat for the next two days. Some segments of his right hand had no sensation.

**ANSWER:    Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 166's allegations and therefore deny the same.**

167.    Immediately after his release, Mr. Newbold went to the student health office at his medical school. A doctor there sent him to the Emergency Department at Barnes Jewish Hospital.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 167's allegations and therefore deny the same.**

168.    Mr. Newbold was diagnosed with neuralgia (or nerve pain) and neuropraxia (a loss of sensation due to nerve injury.) He experienced hypersensitivity to heat and pain for approximately two and a half days after his arrest. He did not recover full sensation in his right hand for nearly two months.

**ANSWER:   Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 168's allegations and therefore deny the same.**

169.    Mr. Newbold now believes the only way to avoid any further injury is to never attend any other protests and never record police activity in the city of St. Louis. Attending a protest in St. Louis puts law-abiding citizens at risk of unconstitutional arrest and imprisonment. Recording the police activities marks citizens for retaliatory assault by officers of the SLMPD.

**ANSWER: Defendants are without sufficient knowledge or information to form a belief as to the truth of paragraph 169's allegations and therefore deny the same.**

### COUNT I

170.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:   Paragraph 170 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

171.    Defendants knew or should have known that SLMPD officers did not have probable cause to arrest Plaintiff.

**ANSWER:   Defendants deny paragraph 171's allegations.**

172.    Defendants unreasonably seized Plaintiff, thereby depriving Plaintiff of

Plaintiff's right to be free from unreasonable seizure of Plaintiff's person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

**ANSWER:    Defendants deny paragraph 172's allegations.**

173.    Further, there was no objectively reasonable belief that Plaintiff had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the seizure was unreasonable.

**ANSWER:    Defendants deny paragraph 173's allegations.**

174.    Plaintiff was unreasonably seized when Defendants terminated Plaintiff's freedom of movement by use of kettling.

**ANSWER:    Defendants deny paragraph 174's allegations.**

175.    Defendants' use of kettling without providing warning to Plaintiff was an unreasonable seizure. As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

**ANSWER:    Defendants deny paragraph 175's allegations.**

176.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights. As a direct  and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

**ANSWER:    Defendants deny paragraph 176's allegations.**

177.    At all times, Defendants were acting under color of state law.

**ANSWER:    Defendants deny paragraph 177's allegations.**

178.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**ANSWER:    Defendants deny paragraph 178's allegations.**

45

## COUNT II

179.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:    Paragraph 179 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

180.    Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

**ANSWER:    Defendants admit that all citizens have a fundamental right to speak and to assemble, subject to reasonably time, place and manner regulations; Defendants otherwise deny the conclusions of paragraph 180.**

181.    Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

**ANSWER:    Defendants deny paragraph 181's allegations.**

182.    Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

**ANSWER:    Paragraph 182 contains legal conclusions rather than allegations of fact, requiring no response. To the extent a response is required, denied.**

183.    Defendants' actions violated Plaintiff's First Amendment rights to freedom of

46

the press and freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

**ANSWER:    Defendants deny paragraph 183's allegations.**

184.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

**ANSWER:    Defendants deny paragraph 184's allegations.**

185.    As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

**ANSWER:    Defendants deny paragraph 185's allegations.**

186.    Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

**ANSWER:    Defendants deny paragraph 186's allegations.**

187.    At all times, Defendants were acting under color of state law.

**ANSWER:    Defendants deny paragraph 187's allegations.**

188.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**ANSWER:    Defendants deny paragraph 188's allegations.**

<u>**COUNT III**</u>

189.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:    Paragraph 189 contains no allegations of fact and therefore, requires no**

**response. To the extent a response is required, denied.**

190.    Defendants, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiff's civil rights.

**ANSWER:    Defendants deny paragraph 190's allegations.**

191.    The City of St. Louis itself was a member of the conspiracy because throughout the night, the highest levels of the SLMPD, Department of Public Safety, and City government were involved in the planning, monitoring and/or execution of this event.

**ANSWER:    Defendants deny paragraph 191's allegations.**

192.    As described above, Defendants Leyshock, Sachs, Jemerson, and Rossomanno conspired to design and implement the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff.

**ANSWER:    Defendants deny paragraph 192's allegations.**

193.    Defendants Boyher and Karnowski joined the conspiracy when they directed officers under their control and supervision to execute the illegal kettling plan, with the intent to unlawfully arrest and use excessive force on Plaintiff.

**ANSWER:    Defendants deny paragraph 193's allegations.**

194.    Defendants Ruffin and Does joined the conspiracy when they agreed to participate in the illegal kettling plan and then unlawfully arrested and used excessive force on Plaintiff.

**ANSWER:    Defendants deny paragraph 194's allegations.**

195.    In furtherance of this conspiracy, Defendants committed the following overt acts:

a.    Defendants, acting in concert, kettled and unlawfully seized Plaintiff. They detained Plaintiff's in the City Justice Center for approximately 15 hours.

b.      Defendants used excessive force by tying Plaintiff's hands in the zip-cuffs.

c.      Defendants used excessive force by deploying chemical agent against Plaintiff.

d.      Defendants assaulted Plaintiff.

e.      Defendants initiated charges against Plaintiff that would chill a person of ordinary firmness

**ANSWER:     Defendants deny the allegations contained in paragraph 195 and each of its subparts.**

196.    As a direct and proximate result of the conspiracy between Defendants and others as described above, Plaintiff was subjected to assault; the use of excessive force; the deprivation of the right to be free from unreasonable search and seizure; and malicious prosecution.

**ANSWER:     Defendants deny paragraph 196's allegations.**

197.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and will continue to suffer physical pain and injury and emotional trauma.

**ANSWER:     Defendants deny paragraph 197's allegations.**

198.    The acts described herein were intentional and callously indifferent to the rights of Plaintiff, thus entitling him to an award of punitive damages against the Defendants.

**ANSWER:     Defendants deny paragraph 198's allegations.**

199.    At all times, Defendants were acting under color of state law.

**ANSWER:     Defendants deny paragraph 199's allegations.**

200.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to

42 U.S.C. § 1988.

**ANSWER:**   **Defendants deny paragraph 200's allegations.**

**COUNT IV**

201.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**   **Paragraph 201 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

202.   Defendant City is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for the other Defendants' violation of Plaintiff's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiff are the following:

a.   SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b.   SLMPD custom or policy of using kettling without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

c.   SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

d.   SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens of unlawful conduct;

e.   Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and

arresting individuals without probable cause.

**ANSWER:    Defendants deny the allegations contained in paragraph 202 and each of its subparts.**

203.    Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of kettling and use of excessive force.

**ANSWER:    Defendants deny paragraph 203's allegations.**

204.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

**ANSWER:    Defendants deny paragraph 204's allegations.**

205.    As a direct result of the Defendant City's failures and policies as described herein, Plaintiff suffered damages including: physical injury, fear, apprehension, and concern for Plaintiff's own safety.

**ANSWER:    Defendants deny paragraph 205's allegations.**

206.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**ANSWER:    Defendants deny paragraph 206's allegations.**

## COUNT V

207.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:    Paragraph 207 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

208.    The use of kettling, without warning and without a way to egress, caused Plaintiff to experience apprehension of immediate physical injury.

**ANSWER:    Defendants deny paragraph 208's allegations.**

209.    The brandishing and deployment of chemical agents for no lawful reason by Defendants caused Plaintiff to experience apprehension of immediate physical injury.

**ANSWER:    Defendants deny paragraph 209's allegations.**

210.    The arrest of Plaintiff by Defendants, without explanation, and the placement of Plaintiff's hands in zip-cuffs purposely placed Plaintiff in apprehension of immediate physical injury.

**ANSWER:    Defendants deny paragraph 210's allegations.**

211.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: apprehension, fear, concern for Plaintiff's own safety, and physical injury.

**ANSWER:    Defendants deny paragraph 211's allegations.**

212.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:    Defendants deny paragraph 212's allegations and conclusions.**

213.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

**ANSWER:    Defendants deny paragraph 213's allegations and conclusions.**

214.   By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:   Defendants deny paragraph 214's allegations and conclusions.**

215.   The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:   Defendants deny paragraph 215's allegations.**

<u>**COUNT VI**</u>

216.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:   Paragraph 216 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

217.   Plaintiff was arrested without any legal justification or probable cause by Defendants.

**ANSWER:   Defendants deny paragraph 217's allegations.**

218.   Defendants proceeded to constrain and confine Plaintiff against Plaintiff's free will. There was no lawful justification for Defendants restraining and confining Plaintiff in the above manner.

**ANSWER:   Defendants deny paragraph 218's allegations.**

219.   As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: physical injury, fear, apprehension, and emotional trauma.

**ANSWER:   Defendants deny paragraph 219's allegations.**

220.    The actions of Defendants as described above were carried out in bad faith and with malice, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:**   **Defendants deny paragraph 220's allegations.**

## COUNT VII

221.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:**   **Paragraph 221 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

222.   Defendants intentionally restrained and confined Plaintiff against Plaintiff's will when they took Plaintiff into custody and detained Plaintiff.

**ANSWER:**   **Defendants admit that Plaintiff was arrested in September 17, 2017 with probable cause. Defendants are without sufficient information to form a belief as to the truth of paragraph 222's remaining allegations, and therefore deny the same.**

223.   Plaintiff did not consent to Defendants' actions in removing and confining Plaintiff in the manner described above, nor in any manner whatsoever.

**ANSWER:**   **Defendants are without sufficient information to form a belief as to the truth of paragraph 223's allegations, and therefore deny the same.**

224.   There was no lawful justification for Defendants to restrain and confine Plaintiff in the manner described above.

**ANSWER:**   **Defendants deny paragraph 224's allegations.**

225.   Defendants held Plaintiff in confinement for a substantial period of time, spanning several hours.

54

**ANSWER:   Defendants are without sufficient information to form a belief as to the truth of paragraph 225's allegations, and therefore deny the same.**

226.   As a direct and proximate result of his false imprisonment by Defendants, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

**ANSWER:   Defendants deny paragraph 226's allegations.**

227.   Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:   Defendants deny paragraph 227's allegations and conclusions.**

228.   Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

**ANSWER:   Defendants deny paragraph 228's allegations and conclusions.**

229.   By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:   Defendants deny paragraph 229's allegations and conclusions.**

230.   Defendants' actions in causing the false imprisonment of Plaintiff, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling him to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

**ANSWER:**   **Defendants deny paragraph 230's allegations.**

**COUNT VIII**

231.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**   **Paragraph 231 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

232.   Defendants made an illegal, improper, and perverse use of process by arresting, charging, and detaining Plaintiff without any legal justification or probable cause in order to harass and intimidate Plaintiff, which constitutes an improper collateral purpose.

**ANSWER:**   **Defendants deny paragraph 232's allegations.**

233.   Defendants acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, in that Defendants used legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

**ANSWER:**   **Defendants deny paragraph 233's allegations.**

234.   As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered damages including: emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

**ANSWER:**   **Defendants deny paragraph 234's allegations.**

235.   Defendants' abuse of process, as described above, was carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

**ANSWER:**    **Defendants deny paragraph 235's allegations.**

<u>**COUNT IX**</u>

236.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**    **Paragraph 236 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

237.    Defendants assisted in the filing of charges against Plaintiff with no probable cause that Plaintiff had committed a crime or ordinance violation.

**ANSWER:**    **Defendants deny paragraph 237's allegations.**

238.    Such charges were subsequently dismissed against Plaintiff. As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

**ANSWER:**    **Defendants deny paragraph 238's allegations.**

239.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:**    **Defendants deny paragraph 239's allegations and conclusions.**

240.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

**ANSWER:**   **Defendants deny paragraph 240's allegations and conclusions.**

241.   By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:**   **Defendants deny paragraph 241's allegations and conclusions.**

242.   The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:**   **Defendants deny paragraph 242's allegations.**

<u>**COUNT X**</u>

243.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**   **Paragraph 243 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

244.   By surrounding Plaintiff, assaulting Plaintiff, spraying Plaintiff in the face at point- blank range with a chemical agent, and arresting Plaintiff without probable cause, Defendants committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

**ANSWER:**   **Defendants deny paragraph 244's allegations.**

245.   Defendants' actions were intentional or, at best, reckless.

**ANSWER:**   **Defendants deny paragraph 245's allegations.**

246.    Such actions by Defendants have caused Plaintiff severe emotional distress that has resulted in bodily harm, as described above.

**ANSWER:**    **Defendants deny paragraph 246's allegations.**

247.    Defendants' sole motivation was to cause emotional distress to Plaintiff and the other people Defendants unlawfully arrested.]

**ANSWER:**    **Defendants deny paragraph 247's allegations.**

248.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for his own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

**ANSWER:**    **Defendants deny paragraph 248's allegations.**

249.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:**    **Defendants deny paragraph 249's allegations and conclusions.**

250.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

**ANSWER:**    **Defendants deny paragraph 250's allegations and conclusions.**

251.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:**    **Defendants deny paragraph 251's allegations and conclusions.**

252.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:    Defendants deny paragraph 252's allegations.**

**COUNT XI**

253.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:    Paragraph 253 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

254.    Alternative to Count XI, above, by surrounding Plaintiff, assaulting Plaintiff, spraying Plaintiff with pepper spray in the face at point-blank range, and arresting Plaintiff without probable cause, Defendants realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

**ANSWER:    Defendants deny paragraph 254's allegations.**

255.    Further, Plaintiff was reasonably in fear for his own person because of the actions of Defendants and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

**ANSWER:    Defendants deny paragraph 255's allegations.**

256.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:**   **Defendants deny paragraph 256's allegations and conclusions.**

257.   Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

**ANSWER:**   **Defendants deny paragraph 257's allegations and conclusions.**

258.   By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:**   **Defendants deny paragraph 258's allegations and conclusions.**

259.   The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:**   **Defendants deny paragraph 259's allegations.**

<u>**COUNT XII**</u>

260.   Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**   **Paragraph 260 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

261.   Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

**ANSWER:**    Defendants deny paragraph 261's allegations.

262.    The use of force against Plaintiff, by dragging him through the streets and inflicting harm through use of zip-cuffs applied to Plaintiff's wrist and application of pepper spray, was objectively unreasonable.

**ANSWER:**    Defendants deny paragraph 262's allegations.

263.    The use of kettling, without warning, was objectively unreasonable and constituted excessive force.

**ANSWER:**    Defendants deny paragraph 263's allegations.

264.    The use of pepper spray was objectively unreasonable and constituted excessive force.

**ANSWER:**    Defendants deny paragraph 264's allegations.

265.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

**ANSWER:**    Defendants deny paragraph 265's allegations.

266.    At all times, Defendants were acting under color of state law.

**ANSWER:**    Defendants deny paragraph 266's allegations.

267.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**ANSWER:**    Defendants deny paragraph 267's allegations.

## COUNT XIII

268.    Plaintiff incorporates by reference each and every allegation contained in

the preceding paragraphs as if fully set forth herein.

**ANSWER:**   **Paragraph 268 contains no allegations of fact and therefore, requires no response. To the extent a response is required, denied.**

269.   During the process of being unconstitutionally arrested, Plaintiff suffered battery at the hands of Defendants.

**ANSWER:**   **Defendants deny paragraph 269's allegations.**

270.   Namely, Defendants' physically aggressive tactics caused intentional and offensive bodily harm to Plaintiff.

**ANSWER:**   **Defendants deny paragraph 270's allegations.**

271.   In spraying Plaintiff directly in the face with pepper spray — when Plaintiff was already attempting to comply with Defendants' directives — caused further intentional  and offensive bodily contact.

**ANSWER:**   **Defendants deny paragraph 271's allegations.**

272.   As a direct result of Defendants' conduct described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for his own safety, fear, apprehension, depression, anxiety, consternation and emotional distress.

**ANSWER:**   **Defendants deny paragraph 272's allegations.**

273.   Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

**ANSWER:**   **Defendants deny paragraph 273's allegations and conclusions.**

274.   Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole

63

purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . ..."

**ANSWER:**    **Defendants deny paragraph 274's allegations and conclusions.**

275.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

**ANSWER:**    **Defendants deny paragraph 275's allegations and conclusions.**

276.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**ANSWER:**    **Defendants deny paragraph 276's allegations.**

## OTHER ANSWERS

**1.**     **Defendants deny all allegations of fact contained in the un-numbered "introduction" paragraph to Plaintiff's Second Amended Complaint.**

**2.**     **Defendants deny all allegations of fact contained in the "WHEREFORE" clause located after paragraph 276 of Plaintiff's Second Amended Complaint.**

**3.**     **Defendants request a jury trial on all issues so triable.**

## AFFIRMATIVE DEFENSES

**1.**     **Further answering, Defendants and each of them state that Plaintiff's Second Amended Complaint fails to state a claim upon which relief can be granted in each and every count**

**2..**     **Further answering, Defendants and each of them state that all actions of the individual Defendant officers with regard to Plaintiff were taken on the basis of probable**

cause or arguable probable cause to believe that Plaintiff was violating ordinances or statutes, that Defendants reasonably believed that said defendants' actions were lawful, that no act of Defendants violated any clearly established constitutional right of Plaintiff, and so the individual Defendants are immune from liability by reason of the doctrine of qualified immunity. Because the individual Defendants herein committed no constitutional tort, Defendant City of St. Louis is not liable to Plaintiff on any theory.

3.      Further answering, Defendants and each of them state that Plaintiff failed to mitigate his damages by failing to disperse as requested by officers of the law and by failing promptly to seek medical attention or treatment for claimed injuries.

4.      Further answering, Defendants state that all state law claims asserted against any defendant in an individual or official capacity are barred by sovereign immunity  or by official immunity in that the individual defendants herein, in taking any actions with regard to Plaintiff were exercising discretion in the performance of official duties in preserving public order and arresting persons reasonably believed to be violating valid ordinances or statutes.

5.      Further answering, Defendants state that all state law claims asserted against any defendant in an individual or official capacity are barred because, at the time of each Plaintiff's alleged injury, each individual defendant was performing a public duty in responding to an unlawful assembly and other unlawful acts of numerous persons so as to preserve public order and the rights of the public in general.

6.      Further answering, Defendants state that liability, if any, to Plaintiff cannot be joint and several, and damages, if any, can be awarded against any defendant solely based on that individual defendant's conduct directly causing such damages.

7.      Further answering, Defendants state that any use of force by the individual defendants herein against Plaintiff was privileged because the force was used reasonably applied (a) in order to overcome unlawful resistance to or interference with an arrest, which Plaintiff knew was occurring, (b) in self-defense by the individual defendants, against whom Plaintiff used or threatened to use force to prevent defendants from arresting another person or persons, (c) in defense of third persons, namely other officers at the scene of Plaintiff's arrest, against whom Plaintiff was using or threatening the use of force, or (d) as otherwise authorized by Missouri law, including but not limited to §563.021 and §563.046, RSMo.

8.      Further answering, Defendants state that the injuries suffered by Plaintiff, if any, were of such a nature as can be remedied by existing remedies under the law of Missouri, which state law remedies are sufficient post-deprivation remedies so that Plaintiff was not and is not deprived of any liberty or property interest without due process of law as prescribed by the Fourteenth Amendment by reason of the acts or conduct of Defendants.

9.      Further answering, Defendants state that, with respect to any negligent count asserted by Plaintiff, if Plaintiff suffered any injury by reason of any negligent action of Defendants--which Defendants deny--then and in that event fault must be apportioned to Plaintiff by reason of Plaintiff's negligence or assumption of risk in that Plaintiff chose to encounter the known risk of injury to himself arising from the alleged breach of duty by defendants.

10.     Further answering, the state law claims against Defendant City of St. Louis are barred by sovereign immunity.

11.     Defendant incorporates each and every additional affirmative defense that may be

uncovered or made known during the investigation and discovery of this case. Defendant

specifically reserves the right to amend this Answer to include additional affirmative

defenses at a later time.

WHEREFORE, having fully answered, Defendants respectfully request that this

Court dismiss this case, with prejudice, and for any other such relief as this Court deems

proper.


Respectfully submitted,
JULIAN L. BUSH
CITY COUNSELOR

*/s/ Amy M. Raimondo*
Amy Raimondo 71291MO
Assistant City Counselor
raimondoa@stlouis-mo.gov
Brandon Laird, 65564 MO
Assistant City Counselor
lairdb@stlouis-mo.gov
Robert H. Dierker 23671MO
Associate City Counselor
dierkerr@stlouis-mo.gov
Abby Duncan 67766 MO
Assistant City Counselor
Megan Bruyns 69987MO
Assistant City Counselor
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956
*Attorneys for Defendants*